# In the United States Court of Federal Claims

No. 19-1966
(Filed: 28 May 2021)

*******************************************

| | |
|---|---|
| CONFEDERATED TRIBES AND BANDS OF THE YAKAMA NATION, et al. | * <br> * <br> * |
| Plaintiff, | * <br> * |
| v. | * <br> * <br> * |
| THE UNITED STATES, | * <br> * |
| Defendant. | * <br> * |

*******************************************

Motion to Dismiss; RCFC 12(b)(1); RCFC 12(b)(6); Indian Tucker Act; NIFRMA; Mitchell II; Breach of Trust; Fiduciary Duties; Tribal Forest Management; Yakama Tribe.

*Ethan Jones*, with whom was *Marcus Shirzad*, Yakama Nation Office of Legal Counsel, of Toppenish, Washington, for all plaintiffs, and *Josh Newton*, with whom was *Sarah Monkton*, Karnopp Petersen LLP, of Bend, Oregon, for plaintiff Confederated Tribes and Bands of the Yakama Nation.

*Peter K. Dykema*, Trial Attorney, Environment and Natural Resources Division, with whom was *Paul E. Salamanca*, Deputy Assistant Attorney General, Environment and Natural Resources Division, all of Washington, D.C. for the defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiffs Confederated Tribes and Bands of the Yakama Nation ("Tribe") and Yakama Forest Products ("YFP") bring this action under 28 U.S.C. § 1505 ("Indian Tucker Act") and 28 U.S.C. § 1491(a)(1) ("Tucker Act"), alleging the United States breached fiduciary duties owed to plaintiffs in managing the Yakama Forest. Plaintiffs argue federal forest management statutes, regulations, and an 1855 treaty between the Tribe and the United States require the government to ensure timber harvests in the Yakama Forest meet minimum targets. Plaintiffs claim the government's failure to do so breached the government's fiduciary duties to plaintiffs, and those breaches are enforceable through money damages. The government moved to dismiss plaintiffs' complaint for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). The Court held oral argument on the government's motion on 2 February 2021. For the following reasons, the Court **DENIES** the government's motion to dismiss.

## I.  Background

The Court draws the following facts from plaintiffs' complaint and response to the government's motion to dismiss, construing the complaint broadly and drawing all inferences in plaintiffs' favor.  *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1288 (Fed. Cir. 1999) (noting an obligation of courts to "construe the complaint broadly [by] drawing all inferences in [plaintiffs'] favor" at the motion to dismiss stage).

### A.  The Yakama Tribe and the Management of the Yakama Forest

This case presents a claim with its genesis as old as this Court.[1]  Plaintiff Yakama Nation is an Indian tribe federally recognized under the Treaty with the Yakamas, dated June 9, 1855. Compl., ECF No. 1 ("Compl."), at ¶ 3.  The Treaty created the 1.4 million-acre Yakama Reservation ("Reservation") in south-central Washington state, approximately 650,000 acres of which are forested lands ("Yakama Forest" or "Forest").  *Id.* at ¶¶ 2, 3, 6.  The Reservation is located on the traditional homeland of the Tribes comprising the Yakama Nation, which they have occupied "since time immemorial."  Pls.' Resp. to Mot. to Dismiss, ECF No. 14 ("Pls.' Resp."), at 7.  Plaintiffs' claim centers on the government's commitments to the Tribe in managing the extensive forest resources on this land.  Compl. at ¶ 10–14.

Through the Treaty, the government made many commitments to the Tribe.  *See* Treaty with the Yakamas, dated June 9, 1855, 12 Stat. 951, Art. IV–X ("Treaty") (listing the government's obligations to the Tribe).  Among them include the commitment to set the Reservation aside "for the exclusive benefit" of the Yakama Nation, and the government would build a sawmill for the Tribe and to keep the mill "in repair and furnished with the necessary tools and fixtures."  Pls.' Resp. at 8; Compl. at ¶ 7 (quoting Treaty at Art. V).  While it is unclear whether the government followed through with its commitment to build the sawmill, harvesting timber resources from the Yakama Forest eventually became an important source of revenue for the Tribe.  *Id.* at ¶¶ 3–9.[2]

The United States holds in trust all tribal forest land on the Yakama Reservation.  Compl. ¶ 5; *see also* 25 U.S.C. § 3101(2) ("[T]he United States has a trust responsibility toward Indian forest lands.").  While the forest lands on the Yakama Reservation are federally managed for the Tribe's benefit, harvesting timber resources on the Reservation must proceed under the process prescribed by federal forest management statutes and regulations.  *See* 25 U.S.C. § 407 ("*Under regulations prescribed by the Secretary of the Interior*, the timber on unallotted trust land in Indian reservations or on other land held in trust for tribes may be sold in accordance with the principles of sustained-yield management . . . .") (emphasis added).  The Tribe itself cannot harvest timber or organize timber sales to non-tribal members absent approval from the government.  *See* 25 C.F.R. § 163.3(b)(2) (providing tribes a "consultation" role in developing forest management plans); Forest Management Plan for Yakama Reservation (September 2005),

---

[1] *See* Act of February 24, 1855, 10 Stat. 612 (Feb. 24, 1855) (creating the Court of Claims).
[2] At the 2 February 2021 oral argument, the parties could not confirm whether the government actually constructed the sawmill or other buildings promised in the Treaty of 1855.  *See* Tr. at 79:1–80:11.

ECF No. 14-5 ("2005 FMP"), at 171–78 (describing the process for approving a timber sale in tribal lands pursuant to federal government's forest management program).[3]

Plaintiff Yakama Forest Projects ("YFP") is a tribal corporation wholly owned by the Yakama Nation.  Compl. at ¶ 4.  The Tribe incorporated YFP in 1995 to "promote the development and utilization of the Reservation's timber resources on a sustained yield basis." *Id.*  The Tribe intended YFP to create jobs for tribal members by operating a commercial log sort yard and sawmill on the Reservation.  *Id.*  The YFP sawmill's "principal log supply comes from the Yakama Nation's forest land," making the mill's productivity dependent on the government's management of the Yakama Forest.  *Id.*; see also Tr. at 100:9–12 (plaintiffs noting YFP only processes logs "from off-reservation sources in very limited circumstances because it's just not economically viable.").

The United States Department of the Interior's ("Interior") Bureau of Indian Affairs ("BIA") manages the Tribe's forest resources.  Compl. at ¶ 8; 25 U.S.C. §§ 406–407; 25 U.S.C. § 5109; 25 U.S.C. §§ 3101–3120.  It does so pursuant to a Forest Management Plan ("FMP"), the "principal document, approved by the secretary . . . which provides for the regulation of the detailed, multiple use operation of Indian forest land."  25 U.S.C. § 3103(5).  The current operative FMP for the Yakama Forest was approved by the Secretary in 2005 ("2005 FMP"). Compl. ¶ 8–9.

The 2005 FMP prescribes the Yakama Forest's current management process and objectives.  *See* 2005 FMP at 11 (discussing the FMP's "mission, goals, objectives").  The plan sets, *inter alia*, harvest goals and schedules, *id.* at 126, silviculture prescriptions, *id.* at 125, and forest-fire-control measures, *id.* at 110.  The FMP also establishes the Annual Allowable Cut ("AAC"), which provides a targeted-maximum harvest level for the forest's timber resources. *See* 2005 FMP at 126.  The AAC is designed to meet the principles of sustained yield as mandated by the forest management statutes.  *See, e.g.,* 25 U.S.C. § 3104(b)(1) ("Indian forest land management activities undertaken by the Secretary shall be designed to achieve the following objectives . . . the development, maintenance, and enhancement of Indian forest land in a perpetually productive state in accordance with the principles of sustained yield and with the standards and objectives set forth in forest management plans . . . .").  The 2005 FMP, approved by both the Secretary of the Interior and the Tribe, prescribes an AAC of 143 million board feet. Compl. at ¶ 9.[4]  In 2015, the BIA issued an addendum to the 2005 FMP ("Addendum"), revising the AAC to 93.4 million board feet.[5]  *Id.*  Plaintiffs claim "[a]t all times since June 18, 2013, the BIA has failed to authorize sufficient timber sales that would achieve either the AAC contained in the 2005 FMP or the 2015 proposed revision to the AAC."  *Id.*

---

[3] At the 2 February 2021 oral argument, the government agreed it has "the lead role" in managing timber on Tribal land and the tribe "does not have a veto power" over the government's timber sales.  *See* Tr. 38:12–39:6.

[4] The BIA conducted a forest inventory analysis in 2010, "which estimated an AAC of 106 million board feet for the period from 2005 to 2015."  Compl. at ¶ 9.

[5] While the Tribe approved the 2005 FMP, it has yet to approve the 2015 Addendum.  *Id.*  It is also unclear from the record whether the Secretary of the Interior has approved the 2015 addendum.  Pls.' Resp. at 17 ("To Plaintiffs' knowledge, the Addendum has not been approved by the Secretary").

**B.  Plaintiffs' Supplemental Jurisdictional Facts[6]**

The Yakama Nation has "inhabited the Yakama Reservation's land since time immemorial," Pls.' Resp. at 7, with the forest lands on the Reservation "continu[ing] to be critical to the Yakama Nation's economic well-being." *Id.*  When the Tribe and the United States entered the 1855 Treaty, agreements over "land, timber and the future sawmill were an integral part of the [] negotiations." *Id.* at 8.  The Tribe believed the Treaty would ensure long-term access to forest resources for the Tribe's benefit. *Id.*  The Tribe ultimately agreed to the Treaty, and demand for Yakama Forest timber quickly grew. *Id.* at 9.

The United States began its major commercial timber harvesting program in the Yakama Forest following the outbreak of World War II.  Pls.' Resp. at 9.  The BIA first prepared a Timber Management Plan specifying which portions of the Yakama Forest were subject to harvest each year. *Id.*  Soon after adoption of the plan, "[i]ntensive federal forest management" to increase timber harvests began. *Id.*  The Tribe's reliance on forest resources, and the income it created, grew steadily with the increase of federal timber harvests. *See id.*

The government "increased the Yakama Forest AAC from 135 million board feet ("MMBF") in 1962 to a planned 186 MMBF in 1974." *Id.* at 9.  The increased AAC resulted in harvests of "1.5 billion board feet with a gross stumpage value of $201 million" over the life of the 1962 plan.  Pls.' Resp. at 9.  In 1983, the government adjusted the AAC to 162.7 MMBF "after the Yakama Nation decided to place twenty-five percent of the Yakama Forest into reserved status." *Id.*  In total, the 1983 plan "authorized harvests of 636 MMBF over the next decade with a gross stumpage value of $132 million." *Id.* at 9–10.  Instead of continuing under the 1983 AAC, however, the government in 1993 "identified a plan for a lower AAC of 143 MMBF with potential for greater revenues." *Id.*

By the early 1990s, the Tribe "recognized that it had not been realizing the full value of its timber assets by collecting stumpage from non-Indian lumber mills."  Pls.' Resp. at 10.  In 1994, the Tribe developed its "modern timber enterprise policy," which "provided for establishment of a sawmill operation to produce value-added forest products and a much-needed source of employment for Yakama Nation members." *Id.*  Part of the policy was the incorporation of Yakama Forest Products for the Tribe's benefit. *Id.*  YFP's productivity peaked in 2005, processing "150 MMBF of timber and provid[ing] approximately 240 jobs, of which approximately ninety percent (90%) were held by Yakama Nation tribal members." *Id.*  Today, YFP "requires at least 75 MMBF annually to break even, and at least 100 MMBF annually to minimally achieve the Yakama's timber enterprise policy." *Id.*

The 2005 FMP "expressly acknowledges the 'Congressional trust responsibilities for management of the Yakama Reservation forest resources have been delegated to the BIA Yakama Agency Superintendent.'"  Pls.' Resp. at 11 (quoting the 2005 FMP).  The 2005 FMP "defines how trust responsibilities will be fulfilled and incorporates the statutory management

---

[6] The supplemental jurisdictional facts were not included with the original complaint, *see* Compl. ¶ 3–4, and were presented for the first time to further establish this Court's jurisdiction in plaintiffs' Response,  Pls.' Resp. at 11 ("Supplemental Jurisdictional Facts: The United States' Alleged Breaches of its Fiduciary Duties Owed to plaintiffs for Managing the Harvest of Timber from the Yakama Forest").

objectives set forth" in the federal forest management statutes. *Id.* (internal quotation marks omitted). The 2005 FMP identifies the sustained yield to be 158.4 MMFB and includes an annual harvest schedule for the years 2005 to 2014. *Id.* The 2005 FMP also includes a "variable, declining AAC beginning at 158.4 MMBF and gradually reducing to 143.3 MMBF" over the life of the plan. *Id.* at 12. The Yakama Nation agreed to the gradually declining AAC to "avoid a forecasted sharp reduction of revenue or jobs immediately following the planning period." *Id.* (Internal quotation marks omitted).

In 2009, the BIA began assessing staffing levels at the Yakama field office. Pls.' Resp. at 12. The BIA produced a "Workforce Analysis Report containing a staffing analysis of its fiduciary management of the Yakama Forest." *Id.* The report concluded "staffing levels for [the Yakama field office] 'are approaching crisis levels in such that existing staff cannot perform in accordance with the forest management plan and their trust responsibilities.'" *Id.* "The Report ultimately concluded that the reduced staffing levels confirmed the United States' inability to fulfill its federally mandated mission and department goals." *Id.* at 13. (Internal quotation marks and alteration marks omitted).

In 2010, the BIA conducted a forest inventory analysis for the Yakama Forest. Pls.' Resp. at 13. The analysis "calculated an AAC of 106 MMBF for the period of 2005 to 2015, which was substantially less than the 2005 FMP's AAC." *Id.* The Tribe claims "the 2010 inventory made no attempt to reconcile its AAC calculation with the AAC calculation in the 2005 FMP." *Id.* A BIA regional timber sale officer for the Yakama office conducted a site report in 2012, identifying "significant program weakness within the BIA Branch of Forestry." *Id.* The report "observed that failure to fill vacant positions was a significant issue, and noted that the Forest Manager for the BIA Branch of Forestry reported having twenty-one vacant positions." *Id.*

The Yakama Nation initiated "government-to-government consultation" in May 2013 to express "concerns that the BIA Branch of Forestry's staffing levels were inadequate to perform the necessary forestry operations within the Yakama Forest." Pls.' Resp. at 14. The Tribe "demanded that the BIA fulfill its trust obligations by funding and filling the many vacancies identified within the 2009 Workforce Analysis Report, noting that failure to do so would result in severe impacts to employment, tribal government operations, tribal enterprises, and most importantly the people of Yakama Nation." *Id.* (internal quotation marks omitted).

The BIA "organized and held a *Yakama Nation Forestry Summit*" at the Reservation in 2013. Pls.' Resp. at 14 (emphasis in original). At the summit, BIA officials assured the Yakama Nation the BIA would "honor the United States' treaty and trust obligations by addressing the Yakama Nation's forestry needs, and that the two parties would work together to address these issues." *Id.* The BIA agreed at the summit to "fill several key staff vacancies." *Id.* By March of 2014, however, the government had yet to follow through on the promises from the summit. *Id.* The Yakama Nation sent a letter to the director of the BIA, "requesting an emergency government-to-government consultation." *Id.* In the letter, the Tribe "outlined the profound impacts vacancies had on its ability to: (1) manage the Yakama forest, (2) develop budget forecasts relating to forest fires, and fuels, (3) navigate the timber sale process, (4) timely and efficiently work through NEPA, (5) update and maintain the Yakama Nation's annual allowable cut calculations, and (6) address the inactivity of the allotments timber sales, and (7) to properly

utilize the timber appraisal system." *Id.* at 14–15 (internal alteration marks omitted).  The letter also "specifically addressed the BIA's failure to achieve the AAC and that failure's resulting impact on the Yakama Nation."  *Id.* 15.

The BIA director responded to the Tribe on 4 June 2014, acknowledging "staffing is a critical issue that needs to be addressed at once," and "[s]taffing of BIA forestry programs is a problem nationwide and very nearly a crisis."  Pls.' Resp. at 15 (internal quotation marks omitted).  The director again promised "that the Yakama Agency would be at the 'forefront' of the BIA's efforts to increase staffing levels."  *Id.*  In a 6 August 2014 follow-up letter from the BIA Northwest Regional Director, the BIA stated "the overall solution to filling vacancies and reorganization centers on calculating a solid, defendable, and sustainable AAC."  *Id.*

In 2014 the BIA also assembled a team of federal and private experts, known as the "Tiger Team," to "conduct a review of the Yakama Forestry Program."  Pls.' Resp. at 16.  This "Tiger Team" released its final report on 29 January 2015, which was signed by the director of the BIA.  *Id.*  In the Report's cover letter, the BIA director noted "key tasks require immediate attention and advised the BIA Northwest Regional Director it is now the responsibility of the Northwest Region to oversee this effort to ensure the Yakama Agency begins to implement the action items."  *Id.* (internal quotation and alteration marks omitted).  Plaintiffs point to a "remarkable admission" from the Tiger Team Report: "certain events over the past few years have allowed the BIA's Yakama Forestry Program to diminish in its capacity to the point that it is on the verge of collapse."  *Id.* (original emphasis and internal alteration marks omitted).

In September 2017, the Tribe sent a letter to the BIA regional director "reminding the BIA of the key tasks that the Tiger Team Report identified as being required, and of the BIA's fiduciary responsibilities to ensure that those tasks are successfully implemented."  Pls.' Resp. at 17.  The Tribe's letter alleged "the situation had continued to worsen despite issuance of the Tiger Team Report, with the BIA having taken no meaningful step to resolve those critical issues."  *Id.* at 17–18.  The Tribe wrote to the BIA Northwest Regional Director in June 2018, again raising the issue of understaffing of the Yakama Field office and "noting that timber sales had stalled because the BIA was not fulfilling its silvicultural harvest prescription responsibilities."  *Id.* at 18.

In a 2019 memorandum from a BIA forest manager to the BIA Yakama Agency Superintendent, the forest manager "provided his assessment of the BIA Branch of Forestry since he began his position in 2018."  Pls.' Resp. at 18.  The forest manager discussed what he described as "poor forestry practices from 10+ years ago . . . still being practiced," and "critical BIA Branch of Forestry staff [who] have a fundamental lack of forestry knowledge and are generally not capable of performing their jobs."  *Id.*  (Internal quotation and alteration marks omitted).  The forest manger noted "the deck is stacked against making the Branch run more efficiently, and that an honest assessment of the program demands what would be called a hostile takeover of the program."  *Id.*  The forest manager also "observed that the 2005 FMP was self-contradictory, remarkably stating that the forest treatment option available under the 2005 FMP cannot achieve the AAC of 143 MMBF."  *Id.* at 19 (original emphasis and internal quotation marks omitted).  Since 2013, "the BIA has only achieved approximately forty percent of the cumulative AAC from the Yakama Forest."  *Id.*

### C.  The Government's Fiduciary Responsibilities on Tribal Forest Land

The government's fiduciary responsibilities in managing Indian-owned forest land are well established.  *See United States v. Mitchell*, 463 U.S. 206, 210, 226 (1983) ("*Mitchell II*") (holding the government has a fiduciary responsibility to manage allotted forest land consistent with the principles of sustained yield); *The Confederated Tribes of Warm Springs Reservation of Oregon v. United States*, 248 F.3d 1365, 1370 (Fed. Cir. 2001) ("*Confederated Tribes*") ("[T]he United States has a fiduciary responsibility to manage those timber resources based upon a consideration of the needs and best interests of the Indian owner and his heirs.") (internal quotation marks and citations omitted).  The Supreme Court's landmark decision in *Mitchell II* created the modern framework for breach-of-trust claims in the tribal forest management context.  463 U.S. at 210.  In *Mitchell II*, the Court considered a claim for alleged mismanagement of allotted forest lands held in trust for the Quinault and Quileute Tribes in western Washington state.  *Id.* at 207–11.  Specifically, the tribes alleged the government "failed to manage timber on a sustained-yield basis."  *Id.* at 210.  The Supreme Court found the statutes and regulations governing the BIA's management of allotted forest land created a sufficient fiduciary relationship between tribes and the government for Indian Tucker Act jurisdiction over breach-of-trust claims related to tribal forest management.  *Id.*  Observing the Department of the Interior exercises "literally daily supervision over the harvesting and management of tribal timber" and "[v]irtually every stage of the process is under federal control," the Court ultimately found Interior's "pervasive role" in managing tribal forest lands under the 1910 Act and its implementing regulations created various fiduciary duties the government owed to the Indian allotees.  *Id.* at 219, 222 (internal quotation marks and citation omitted).[7]  The Court pointed to language in the 1910 Act directing the Secretary of the Interior to consider "'the needs and best interests of the Indian owner and his heirs,' and that proceeds from such sales be paid to owners 'or disposed of for their benefit.'"  *Mitchell II*, 463 U.S. at 224 (quoting 25 U.S.C. § 406(a)).

Congress further clarified the government's fiduciary responsibilities related to the management of tribal forest land when it enacted the National Indian Forest Resource Management Act ("NIFRMA") in 1990.  Pub. L. 101–630, Nov. 28, 1990, 104 Stat. 4532.  Through NIFRMA, Congress directed Interior to ensure "the development, maintenance, and enhancement of Indian forest land in a perpetually productive state in accordance with the principles of sustained yield and with the standards and objectives set forth in forest management plans."  25 U.S.C. § 3104.  Congress did not intend for NIFRMA to "diminish or expand the trust responsibility of the United States toward Indian forest lands, or any legal obligation or remedy resulting therefrom."  25 U.S.C. § 3120.

## II.  Procedural History

Plaintiffs filed this complaint on 27 December 2019, asserting one claim for relief: since 18 June 2013 the government breached various fiduciary duties owed to the Tribe by failing to properly manage the Yakama Forest.  Compl. at ¶¶ 1, 10–14.

On 26 May 2020, the government moved to dismiss plaintiffs' complaint under RCFC Rule 12(b)(1) and Rule 12(b)(6).  Motion to Dismiss, ECF No. 11 ("Gov't Mot. to Dismiss"), at

---

[7] *See* Pub. L. 61-313, June 25, 1910, 62 Stat. 2787.

1. On 24 August 2020, plaintiffs responded to the government's motion to dismiss, providing thirteen pages of additional factual allegations and over 1,200 pages of supporting exhibits. Pls.' Resp. at 7–20, Decl. of Ethan Jones in Supp. of Pls.' Resp. to Mot. to Dismiss, ECF No. 14-1. On 14 September 2020, the government filed a reply in support of its motion to dismiss, arguing in part the Court should ignore plaintiffs' supplemental factual allegations and exhibits for purpose of resolving the motion to dismiss. Reply Mem. in Supp. Of the United States' Mot. to Dismiss, EFC No. 17 ("Gov't Reply"), at 2. On 29 September 2020, plaintiffs filed a motion for leave to file a surreply to address the government's objection to plaintiffs' supplemental facts and exhibits. Pls.' Mot. for Leave to File Surreply, ECF No. 18 ("Pls.' Mot. for Surreply"). On 13 October 2020, the government filed a response in opposition to plaintiffs' request for a surreply, to which plaintiffs filed a reply on 20 October 2020. The United States' Opp'n to Pls' Mot. for Leave to File Surreply, ECF No. 20 ("Gov't Opp'n to Surreply"); Pls.' Reply in Supp. of Its Mot. for Leave to File Surreply, ECF No. 21. On 4 November 2020, the Court held a status conference to discuss the parties' briefings regarding plaintiffs' request to file a surreply. Order, ECF No. 22. At the status conference, the parties agreed to allow both parties to file an additional surreply and agreed to a surreply briefing schedule, and on 5 November 2020, the Court issued an order denying the motion to file a surreply as moot. Order, ECF No. 23. Plaintiffs filed a surreply on 1 December 2020. Pls' Surreply in Resp. to Mot. to Dismiss, ECF No. 24 ("Pls.' Surreply"). The government filed its response to plaintiffs surreply on 22 December 2020. Resp. to Pls.' Surreply in Supp. of the United States' Mot. to Dismiss, ECF No. 25 ("Gov't Resp. to Pls.' Surreply"). On 2 February 2021, the Court held a virtual oral argument to discuss the government's motion to dismiss and the parties' related briefing. *See* Order, ECF No. 27.

## III. Jurisdiction

When resolving a motion to dismiss under both RCFC 12(b)(1) and 12(b)(6), the Court engages in two independent inquires. *See Jan's Helicopter Serv. v. FAA*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (holding that when considering a motion to dismiss, "the merits of the claim [are] not pertinent to the jurisdictional inquiry")*.* Though the analyses are distinct, plaintiffs must plead sufficient facts to state a plausible claim *and* establish jurisdiction. *See Crow Creek Sioux Tribe v United States*, 900 F.3d 1350, 1354–55 (Fed. Cir. 2018) ("[T]he Supreme Court's 'plausibility' requirement for facial challenges to claims under Rule 12(b)(6), as set out in *Bell Atlantic Corp v. Twombly* . . . and *Ashcroft v. Iqbal* . . . also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1).").

When considering a motion to dismiss under RCFC 12(b)(1), "[a] plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *Inter-Tribal Council of Ariz. v. United States*, 956 F.3d 1328, 1337–38 (Fed. Cir. 2020) (quoting *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010)) (internal quotation marks omitted). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). "If a Rule 12(b)(1) motion simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those

allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); 2A James W. Moore et al., *Moore's Federal Practice* ¶ 12.07[2.-1], at 12-51 to -52 (1993)); *see also N. Hartland, L.L.C. v. United States*, 309 F. App'x 389, 391 (Fed. Cir. 2009) (citing *Scheuer*, 416 U.S. at 236).  When presented with a challenge to the court's jurisdiction which "den[ies] or controvert[s] necessary judicial allegations . . . ," "the court may consider evidence outside the pleadings to resolve the issue."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996) (citing *Reynolds v. Army & Air Force Exchange Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988)).

Similarly, when considering a motion to dismiss under RCFC 12(b)(6), the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  The court cannot rely on conclusory statements and legal assertions when determining whether the complaint contains sufficient allegations to plausibly claim breach of trust.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  "A complaint should not be dismissed for failure to state a claim, 'unless the complaint fails to 'state a claim to relief that is plausible on its face.'"  *Inter-Tribal Council of Ariz.*, 956 F.3d at 1338 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint is facially plausible if the court can "draw the reasonable inference that the [d]efendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## IV.  Parties' Arguments

Plaintiffs identify two independent sources of law establishing fiduciary duties to support their claim:  First, NIFRMA, along with the network of statutes and regulations analyzed by the Court in *Mitchell II*, creates enforceable fiduciary duties requiring the government to meet minimum timber-harvest targets.  Compl. at ¶ 11.  Second, the 1855 Treaty created a fiduciary obligation on behalf of the government to ensure the Tribe has access to sufficient timber resources.  *Id.*  In arguing the government breached the fiduciary duties established by the forest management statutes and the Treaty, plaintiffs claim: (1) the government "fail[ed] to prepare and approve sufficient timber sales to achieve the maximum AAC authorized by applicable law"; (2) the government "fail[ed] to provide an adequate log supply for YFP"; and/or (3) the government "fail[ed] to otherwise manage the Yakama forestry program in a manner that allowed the Nation to receive not only the stumpage value from its forest lands, but also the benefit of all labor and profit that the Yakama Forest is capable of yielding."  *Id.* at ¶ 13.  Plaintiffs claim they suffered damages "in an amount not less than $10,000,000."  *Id.* at ¶ 14.

The government's motion to dismiss and reply in support of its motion to dismiss raise three distinct issues: (1) whether this Court has subject-matter jurisdiction over plaintiffs' claims under the Indian Tucker Act; (2) whether plaintiffs' complaint plausibly claims the government breached the identified fiduciary duties; and (3) whether the Court should consider plaintiffs' supplemental factual allegations and exhibits filed with their response memorandum when deciding the present motions.  Gov't Mot. to Dismiss at 14, 23; Gov't Reply at 1–2.

### A.  The Government's 12(b)(1) Motion to Dismiss

## 1. The government argues plaintiffs fail to identify specific, statutorily prescribed fiduciary duties enforceable through a claim for damages

The government argues both plaintiffs' statutory and treaty-based theories of fiduciary liability fail to create Indian Tucker Act jurisdiction because "neither basis satisfies the 'plenary control aspect'" of the Supreme Court's breach-of-trust jurisprudence, nor do they include a "specific money-mandating directive to achieving minimum timber-harvest targets." *See* Gov't Mot. to Dismiss at 4, 6, 9, 17. Additionally, the government argues the statutes plaintiffs rely on do not establish a specific fiduciary obligation to maximize timber harvest revenue from Indian forest land. *See* Tr. at 24:4–9.

The government seeks to distinguish this case from *Mitchell II* in two distinct ways. First, the government argues the only substantive law plaintiffs identify in their complaint as possibly establishing a fiduciary duty to achieve a certain level of timber harvests is NIFRMA, which was not enacted until after the Court decided *Mitchell II*. *See* Gov't Resp. to Pls.' Surreply at 2; Gov't Reply at 13; Tr. at 26:6–9. Therefore, the Court's analysis in *Mitchell II* is inapplicable to plaintiffs' claim here. *Id.* As the government reads them, the forest management objectives prescribed by NIFRMA are aspirational, and do not create an enforceable fiduciary obligation to approve a minimum amount of timber harvests. Gov't Mot. to Dismiss at 15–16; Tr. at 56:7–11. Further, the government claims NIFRMA establishes "Tribal timber management is a shared responsibility," with "conflicting" objectives and aspiration goals which simply relate to a broader mission to ensure self-sustainable communities rather than creating enforceable fiduciary duties. Gov't Mot. to Dismiss. at 16. Therefore, nothing in NIFRMA expresses any intent from Congress that the government assert plenary authority over tribal forest land or create damages liability for failing to maximize timber-harvest revenue. *Id.*; Tr. at 43:9–11.

Second, the government emphasizes *Mitchell II* involved claims related to management of forest resources on *allotted* lands, rather than the *unallotted* tribal-trust lands at issue here. Gov't Mot. to Dismiss at 8; Tr. at 12:10–22. The government argues this is a material distinction because it dictates the nature of the government's fiduciary relationship with the tribal landowner. Gov't Mot. to Dismiss at 8. The Supreme Court's holding in *Mitchell II* is inapplicable, the government argues, because the decision hinged specifically on the "exclusive control" the government asserts over *allotted* lands—a different trust relationship than *unallotted* lands where the Tribe has more management discretion. *Id.* ("Because the allottees lacked the ability to participate in the management of the lands at issue, the government exercised exclusive control [in *Mitchell II*].") (emphasis in original), Tr. at 12:10–22 ("[T]here is considerable language in *Mitchell II* regarding the Government's control of the forest lands of the allottees who were at issue in *Mitchell II*. And the point here is . . . in the management of Indian forest lands, the United States is not in complete control.").

The government argues plaintiffs' Treaty theory is equally untenable because the provision of the Treaty plaintiffs rely on makes no assurances to provide an adequate timber supply to the Tribe's sawmill. Gov't Mot. to Dismiss at 21; Tr. at 73:21–74:2. The government recognizes "Indian treaties should 'be construed liberally in favor of the Indians,'" but argues even a liberal construction of the provision in question does not create the fiduciary duty plaintiffs describe. Gov't Mot. to Dismiss at 21. The government argues the treaty canon of

statutory construction is inapplicable because this canon is "only available to resolve ambiguities," and no ambiguity exists here. *Id.;* Tr. at 82:11–14 ("The canons of construction cannot be used to create provisions out of whole cloth. If there's no ambiguity, the canons don't apply."). The government claims the Treaty provision plaintiffs rely on does not include the promises plaintiffs allege. Gov't Mot. to Dismiss at 23 ("Plaintiff seeks to infer an obligation to provide certain quantities of lumber. But the treaty invoked says nothing of the kind, and the Court may not infer such an obligation."). Accordingly, while the government made many promises to the Tribe through the Treaty, the government argues a commitment to ensure timber harvests occur at any particular volume or rate was not one of them. *Id.*

> ## 2. Plaintiffs' argue this Court has subject-matter jurisdiction over their breach-of-trust claim because it arises under the forest management statutes addressed in *Mitchell II*

Plaintiffs rely on two independent jurisdictional theories to support their claim. First, plaintiffs argue the statutes, regulations, and implementing documents governing the BIA's control over timber sales in the Yakama Forest establish a fiduciary responsibility for the government to meet specific timber harvest targets. Pls.' Resp. at 22. Second, plaintiffs argue the Treaty of 1855 establishes a fiduciary duty for the government to ensure access to an adequate log supply for the Tribe and its sawmill. *Id.* at 24.

Plaintiffs point to the Supreme Court's decision in *Mitchell II* as controlling here, noting their claim relies on the same forest management statutes the Supreme Court identified as creating Indian Tucker Act jurisdiction in *Mitchell II* to establish the statutory source of the trust relationship. *See* Pls.' Resp. at 3–4 (citing *United States v. Mitchell*, 463 U.S. 206 (1983)); Tr. at 14:14–17 ("[The] first question is, does this Court have jurisdiction under *Mitchell II* in certain federal forestry statutes. The short answer is yes."). The fiduciary duties plaintiffs identify flow from the Forest Act of 1910 25 U.S.C. §§ 406–407, the National Indian Forest Resource Management Act ("NIFRMA") 25 U.S.C. § 3101–3120, and the General Forestry Regulations, 25 C.F.R. Part 163 (collectively "forest management statutes."). Pls.' Resp. at 23. Aside from NIFRMA (and modification to the regulations to implement NIFRMA), the statutory scheme governing management of the Yakama Forest is the same network of statutes and regulations at issue in *Mitchell II*. *Id.* The Supreme Court found the 1910 Act, the Indian Reorganization Act of 1934, and BIA's forest management regulations created fiduciary duties and plaintiffs claim the government is therefore liable to the Tribe for damages when breaching those duties. *Id.* Plaintiffs argue "the Supreme Court's landmark decision in *Mitchell II* is both controlling and dispositive of this Court's jurisdiction." Tr. at 14:22–24.

Plaintiffs identify four fiduciary duties—prescribed through these various statutes, regulations and the 2005 FMP—the government both owes to the Tribe and allegedly breached. *See* Pls.' Resp. at 23. Those duties are:

> (1) the duty to manage the Yakama Forest so as to obtain the greatest revenue for the Yakama Nation and its members consistent with the proper protection and improvement of the forests,

(2) the duty to develop, maintain, and enhance the Yakama Forest in a perpetually productive state in accordance with principles of sustained yield and with the standards and objective in the 2005 FMP,

(3) the duty to regulate the Yakama Forest through the implementation of the 2005 FMP in a manner making possible, on a sustained yield basis, continuous productivity and a perpetual forest business, and

(4) the duty to develop the Yakama Forest to promote self-sustaining communities on the Yakama Reservation, so the Yakama Nation (including YFP) and its members receive not only stumpage value, but also the benefit of all the labor and profit the Yakama Forest are capable of yielding.

*Id.* (citations omitted).[8]

The central premise of plaintiffs' statutory theory is the 2005 FMP reflects the government's fiduciary obligations derived from the Forest Management Statutes. *See* Pls.' Resp. at 23. Plaintiffs clarified at oral argument they "have never taken the position . . . that the forest management plan itself is a substantive source of law for jurisdictional purposes," but rather "take the position that it is the principal document identified by NIFRMA and the federal regulations by which the United States fulfills its fiduciary obligations." Tr. at 107:12–18.

Plaintiffs argue, therefore, the government breaches its fiduciary duties when it acts inconsistent with the timber-harvest provisions contained in the 2005 FMP. Pls.' Resp. at 23–24. The forest management statutes require the government to manage tribal forest resources consistent with the principles of sustained yield, and the FMP must reflect these sustained yield principles. Pls.' Resp. at 23 (citing 25 U.S.C. § 3104(b)(1), 25 C.F.R. § 163.11). The government, therefore, has a fiduciary duty to adhere to the 2005 FMP. *Id.* Plaintiffs argue the government breaches duties owed to the Tribe when acting inconsistent with the FMP in a way to undermine timber harvest revenue. *Id.* at 23–24.

### 3. Plaintiffs' argue this Court has subject-matter jurisdiction over breach-of-trust claims related to timber harvests arising under the Treaty of 1855

As an alternative jurisdictional theory, Plaintiffs also argue the government breached fiduciary duties owed to the Tribe through the 1855 Treaty. Pls.' Resp. at 24. Plaintiffs claim the government's commitment to construct a sawmill on the reservation and to keep the mill in "repair and furnished with necessary tools and fixtures" necessarily requires the government to ensure the sawmill runs no less than a minimum level of capacity. *Id.* at 26 ("Documents preserved from the Walla Walla Treaty Council [] confirm the United States' promise of an operational sawmill and timber supply sufficient to meet the purposes of Yakama Reservation.").

---

[8] Plaintiffs point to other cases in which the Federal Circuit or Court of Federal Claims applied the *Mitchell II* analysis to find similar fiduciary duties inherent in the government's management of Tribal forest lands. *See* Pls.' Resp. at 34 (citing *The Confederated Tribes of Warm Springs Reservation of Oregon*, 248 F.3d 1365 (Fed. Cir. 2001) (relying on *Mitchell II* in finding Indian Tucker Act jurisdiction over breach-of-trust claims involving the government's management of tribal forests); *The Blackfeet Tribe of the Blackfeet Reservation v. United States*, Case No. 12-429L, ECF No. 62 (Fed. Cl. Aug. 21, 2015) (same); *Apache Tribe of Mescalero Reservation v. United States*, 43 Fed. Cl. 155 (1999) (same)).

Plaintiffs acknowledge "there's no dispute among the parties that the Treaty is silent with respect to the United States' obligation to maintain an adequate log supply," but argue other courts "have concluded that the Treaty of 1855 has implied or inferred promises to avoid the situation of express promises becoming worthless." Tr. at 77:3–10. This commitment to build a sawmill for the Tribe, plaintiffs argue, inherently creates an implied promise allowing the Tribe to access timber for the mill, and the government's mismanagement of timber sales in the Yakama Forest breaches this implied promise. Pls.' Resp. at 26; Tr. at 84:22–85:11.

In arguing the 1855 Treaty created a fiduciary duty to attain certain timber-harvest targets, plaintiffs' rely heavily on the "treaty canons" of Indian treaty interpretation. *See* Pls' Resp. at 24. Using these canons, the language of the Treaty should be interpreted as originally understood by the Indian ancestors who signed it. *Id.* The treaty canons "arise directly from the United States' unique relationship with Indian tribes." *Id.* (quoting *Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)). Plaintiffs argue this method of interpretation "reflect the principle that courts must honor the context and nature of the negotiations that resulted in a treaty's text to determine the parties' intent." Pls.' Resp. at 24 (referencing *Washington State Dep't of licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1012 (2019)).

Plaintiffs note "the Supreme Court has applied these canons of construction to the Yakama Treaty of 1855 on at least six prior occasions." *Id.* at 24–25 (citing *Washington State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1011 (2019); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979); *Tulee v. Washington*, 315 U.S. 681, 684–85 (1942); *Seufert Bros. Co. v. United States*, 249 U.S. 194, 198 (1919); *Northern Pac. R. Co v. United States,* 227 U.S. 355 362 (1913); *United States v. Winans*, 198 U.S. 371, 380–81 (1905)). In each of these cases, the Court "stressed that the language of the treaty should be understood as bearing the meaning that the Yakamas understood it to have in 1855." Pls.' Resp. at 25 (quoting *Cougar Den, Inc*., 139 S. Ct. at 1011).

Plaintiffs argue this Court should "focus upon the historical context in which [the Treaty] was written and signed." *Id.* (quoting *Cougar Den, Inc.*, 139 S. Ct. at 1011). The "treaty negotiations were conducted in, and the treaty was written in, languages that put the Yakamas at a significant disadvantage," so courts "interpreting Indian treaties may . . . look beyond the treaty's language to the history and context of the negotiations." *Id.* (quoting *Cougar Den, Inc.*, 139 S. Ct. at 1012). Arguing the different articles of the treaty should be read "together," plaintiffs point specifically to Article 2, Paragraph 3 of the treaty as "set[ting] forth that the reservation is going to be held for the exclusive use and benefit of the Yakama Nation," Article 8, Paragraph 1 as "talk[ing] about and acknowledg[ing] the Yakama Nation's dependence upon the United States in the exercise of the[] treaty rights," and "the promise of a sawmill in Article 5." Tr. at 84:22–85:7.

Plaintiffs point to the Ninth Circuit's interpretation of the Treaty of 1855 to support their flexible reading of the Treaty's text. Pls.' Resp. at 25 (citing *United States v. Washington*, 85 F.3d 946 (9th Cir. 2016), *aff'd by an equally divided court*, 138 S. Ct. 1832 (2018)). In *Washington*, the Ninth Circuit applied the treaty canons of construction to conclude the Treaty of 1855 contained implied fishing rights because the "Indians reasonably understood Governor Stevens to promise not only that they would have access to their usual and accustomed fishing places, but also that there would be sufficient fish to sustain them." *Id.* (quoting *Washington*,

853 F.3d at 964).  The "Yakama Nation's ancestors understood that their treaty-reserved right to fish included the implicit right to have fish in the rivers," and plaintiffs argue the same interpretation should apply to the Timber resources implicitly promised to the tribe through the construction of the sawmill.  *Id.* at 26–27.

**B.  The Government's 12(b)(6) Motion to Dismiss**

**1.  The government argues plaintiffs fail to state a plausible claim because the government has no fiduciary duty to maximize timber-harvest revenue for the Tribe**

The government argues plaintiffs failed to state a plausible claim for relief because the government is under no obligation to maximize revenue by ensuring management of the Yakama Forest meets specific timber-harvest targets.  Gov't Mot. to Dismiss at 23; Tr. at 25:19–23.  The government contends plaintiffs' complaint relies "heavily on alleged obligations that stem from the setting of AAC requirements in the 2005 FMP," which is merely an aspirational objective rather than an enforceable mandate.  Gov't Mot. to Dismiss at 23.  The government claims this "objective" is a ceiling—establishing a maximum timber harvest level allowable—rather than a floor establishing a minimum harvest level the government must approve.  *Id.*; Tr. at 122:23–23:1.  The government argues the 2005 FMP does not "promise to remedy its deficiencies," including failure to achieve AAC levels, and accordingly the timber harvest provisions contained within an FMP cannot serve as a waiver of sovereign immunity through which a plaintiff may bring a claim for damages.  Gov't Mot. to Dismiss at 24.

The government points to a recent Court of Federal Claims order denying reconsideration of claims "substantially similar" to those brought by plaintiffs here.  *See* Gov't Motion to Dismiss at 24 (*citing White Mountain Apache v. United States*, Case No. 17-359L, ECF No. 39, at 9 (Fed. Cl. Jun. 19, 2018)).  In *White Mountain Apache*, the Court found Forest Management Plans—governed by the same statutes and regulations plaintiffs rely on here—are merely "statements of priorities rather than express promises."  *Id.*  These priorities are "flexible and subject to change," therefore, the AAC and any other management prescriptions "do not create any legally enforceable duties."  *Id.* at 25, 26.[9]  The government argues plaintiffs' reliance on this impermanent sustainable harvest standard fails because the AAC does not reflect any fiduciary responsibilities enforceable through damages.  *Id.* at 26.

**2.  Plaintiffs argue their claim is facially plausible because the government's failure to approve timber sales sufficient to meet the AAC is evidence the government breached its fiduciary duties**

Plaintiffs argue the government "mischaracterizes plaintiffs' claim as merely the failure to achieve the AAC contained in the 2005 FMP."  Pls.' Resp. at 37.  The precise language plaintiffs use to characterize their claim is a claim for "money damages from the United States arising out of its mismanagement of the Yakama Forest, *including* the BIA's failure to ensure that the full sustainable AAC was achieved each year."  *Id.* (emphasis added).  Plaintiffs

---

[9] The government also argues at least one court has recognized the AAC specifically is a ceiling not a floor, and the government is not obligated to ensure the maximum AAC is met.  Gov't Mot. to Dismiss at 26 (citing *Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336 (1986)).

emphasize they do not rely on the 2005 FMP as a substantive source of law creating a fiduciary duty, but rather the FMP reflects the duties established in the forest management statutes and the 1855 Treaty. *Id.* The 2005 FMP is the "principle document" governing implementation of the forest management statutes and Treaty obligations, and "the United States had a fiduciary duty to manage the Yakama Forest in accordance with the [FMP's] 'standards and objectives.'" *Id.* (quoting 25 U.S.C. § 3104(b)(1)).

Plaintiffs' arguments in opposition to the government's RCFC 12(b)(6) Motion largely overlaps with their jurisdictional argument. Pls.' Resp. at 36. Plaintiffs argue "if the Court denies the United States' Rule 12(b)(1) motion, it should also deny its Rule 12(b)(6) motion because the Court will have necessarily concluded that plaintiffs have stated a plausible claim for relief." *Id.* Jurisdiction under the Indian Tucker Act requires plaintiffs plausibly allege a breach of fiduciary duties enforceable through money damages, and if the Court finds this test satisfied, the Court must also find the plausibility requirement necessary to overcome a motion to dismiss under RCFC 12(b)(6) satisfied. *Id.*

### C. Government's Objection to Plaintiffs' Supplemental Facts

#### 1. The government argues the 12(b)(1) motion to dismiss is a facial challenge to the complaint

The government argues, for the purpose of deciding the present motion, the Court should disregard the supplemental facts and exhibits included in plaintiffs' Response Brief because they were not included in the initial complaint. *See* Gov't Opp'n to Surreply at 2. The government contends its motion to dismiss is a "facial challenge" to the plaintiffs' complaint because the government accepts all of the factual allegations in the complaint as true. *Id.* at 2; Tr. at 133:4–8 ("[O]ur position is a facial challenge to the complaint that the statutes invoked and the Treaty invoked do not on their face confer the authority necessary to create liability. . . .[N]o factual issues are raised by our papers."). The government claims its jurisdictional objections focus on the absence of legal, not factual, control of the Tribe's timber resources. Gov't Opp'n to Surreply at 3. The government argues "Congress has not given Interior the . . . kind of control over the assets necessary to support jurisdiction, to support the holding in *Mitchell II*, and that the specific legal obligations required in *Navajo I* and [*Navajo*] *II* have not been imposed." Tr. at 134: 9–14. Accordingly, plaintiffs' supplemental facts submitted to support their claim do not fall within the factual-challenge exception to the requirement a motion to dismiss defense only rely on the facts contained in the complaint. *See* Gov't Opp'n to Surreply at 6.

#### 2. Plaintiffs argue the government's motion to dismiss raises questions of factual control over the Tribe's timber resources

Plaintiffs contend the government's motion raises *factual* questions, to which they are entitled to respond with supplemental facts of their own. Pls.' Mot. for Surreply at 2. Specifically, plaintiffs interpret the government's motion to dismiss as a factual dispute between the parties regarding the extent of the government's control over managing the Yakama Forest. Pls.' Surreply at 2. Plaintiffs argue this newly raised dispute was not at issue in plaintiffs' complaint, and therefore the plaintiffs "must be given the opportunity to be heard before

dismissal is ordered." Pls.' Surreply at 6 (quoting *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).

Plaintiffs point to the Supreme Court's decision in *United States v. White Mountain Apache*, 537 U.S. 465, 475 (2003) as creating an "alternate path to jurisdiction," which plaintiffs' did not assert in their complaint, but the government opened the door to in its motion to dismiss. *Id.* at 4. This "alternate path," is the function of the government's exclusive control of Indian land. *Id.* The Tribe in *White Mountain Apache* filed a claim alleging the government failed to conduct routine repairs and maintenance to preserve the Fort's condition. *Id.* By finding the government had de facto comprehensive control over the trust corpus, the Court found an enforceable fiduciary relationship. *Id.*

Plaintiffs argue their initial complaint did not raise the "comprehensive control" theory of fiduciary duties, but rather the government's motion to dismiss did– because the government raised this new jurisdictional theory, plaintiffs can respond with supporting factual information. Pls.' Surreply at 4–6. As plaintiffs see it, the government's motion to dismiss gave them the opportunity to argue the *White Mountain Apache* reasoning applies here. *Id.* at 5. Plaintiffs argue even if fiduciary obligations do not flow from the text of the network of statutes and regulations governing forest management on tribal lands—as the Court in *Mitchell II* found—the de facto comprehensive control the government maintains over the Tribe's forest land pursuant to the forest management states creates a fiduciary relationship. *See Id.* at 6–7. According to plaintiffs, because the government denies as a factual matter the extent to which it actually controls plaintiffs' trust land, the motion to dismiss is factual, not facial. *Id.*

## V.  Applicable Law

### A.  Subject-Matter Jurisdiction Under the Indian Tucker Act

The Indian Tucker Act is a jurisdictional statute—it does not create substantive rights. *See United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) ("*Navajo II*") ("Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law."). "A substantive right must be found in some other source of law." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) ("*Mitchell II*"). Accordingly, this Court can only assert Indian Tucker Act jurisdiction over a claim if plaintiffs: (1) identify a substantive source of law creating fiduciary duties for the government, and allege the government breached those duties; and (2) demonstrate the statute "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes." *Inter-agency Tribal Council of Ariz. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020) (quoting *Navajo II*, 556 U.S. at 291).

### 1.  Step One: Whether Plaintiffs Identify Specific Fiduciary Duties

The first step of the *Navajo II* jurisdictional analysis requires plaintiffs "identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the government has failed faithfully to perform those duties." *Navajo II*, 556 U.S. at 290. The substantive law must establish *specific* fiduciary responsibilities the government owes to the tribe

under an explicit statutory provision. *See Inter-Agency Tribal Council of Ariz. Inc.*, 956 F.3d at 1338 (quoting *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1039–40 (Fed. Cir. 2012)) ("'[T]ribes must point to specific statutes [or] regulations that 'establish the fiduciary relationship and define the contours of the [government's] fiduciary responsibilities.'").

A statutorily created general-trust relationship between the government and the Tribe does not, by itself, establish fiduciary duties sufficient for Indian Tucker Act jurisdiction. *See United States v. Mitchell,* 445 U.S. 535 (1980) ("*Mitchell I*") (holding the General Allotment Act establishes a "limited trust" relationship between the Government and the tribe, and does not create specific fiduciary duties the government must fulfill). Plaintiff must point to specific statutory language defining the government's fiduciary role. *Navajo II*, 556 U.S. at 290. Such duties often arise when the government has "comprehensive control" over the trust's corpus. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (observing the government's physical occupation of tribal land inherently leads to government "control at least as plenary as its authority over the timber in *Mitchell II*"). Comprehensive control, however, is not always dispositive of a fiduciary relationship. S*ee Hopi Tribe v. United States*,782 F.3d 662, 671 (Fed. Cir. 2015) (holding the government's comprehensive control over the Hopi Tribe's water system did not create a fiduciary relationship). The relevant inquiry is whether the government's statutory directive "bears the hallmarks of a 'conventional fiduciary relationship,'" with the tribe. *Navajo II*, 556 U.S. at 301 (quoting *White Mountain Apache*, 537 U.S., at 473).

The fiduciary responsibilities must flow from the statutory or regulatory language itself. *See Hopi Tribe*, 782 F.3d at 667 ("[T]he United States is only subject to those fiduciary duties that it specifically accepts by statute or regulation."). Common law principles—which are often used to define the contours of a fiduciary relationship in other contexts—cannot serve such a purpose at this stage of an Indian Tucker Act jurisdictional analysis. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("The common law of trusts does not override the specific trust-creating statute and regulations."). Ultimately, the Court must "train on specific rights-creating or duty-imposing statutory or regulatory prescriptions" when considering whether the statute creates a sufficient fiduciary relationship for Indian Tucker Act jurisdiction. *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo I*").

The government has well-established fiduciary responsibilities in the forest management context. *See, e.g., Mitchell II*, 463 U.S. at 224; *The Confederated Tribes of Warm Springs Reservation of Oregon v. United States,* 248 F.3d 1365, 1370 (Fed. Cir. 2001) ("*Confederated Tribes*"); *Apache Tribe of Mescalero Reservation v. United States*, 43 Fed. Cl. 155 (1999). The BIA asserts "comprehensive control over the management and harvesting of timber on Indian reservations," creating a "fiduciary responsibility to manage those timber resources 'based upon a consideration of the needs and best interests of the Indian owner and his heirs,'" where the "proceeds from the sale of timber harvested from the reservations must be used for the benefit of the Indians or transferred to them," *Confederated Tribes,* 248 F.3d at 1370 (quoting 25 U.S.C. § 406(a)).

The Federal Circuit's analysis in *Confederated Tribes*, where the court found the government breached its fiduciary duties in managing the Tribe's forest resources by failing to "ensure that the Indians receive 'the benefit of whatever profit [the forest] is capable of yielding,'" is illustrative here. *Id.* (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S.

136, 149 (1980)).  Ultimately, the court concluded the provisions of an FMP can reflect the fiduciary responsibilities created through the forest management statutes.  *See id.* at 1370–71 (finding the tribes were entitled to damages for the government's mismanagement of the tribes' forest asserts in a manner that substantially reduced the tribes' income from the harvested timber).

### 2.  Step Two: Whether the Statute is Money Mandating

The second step of the *Navajo II* test requires plaintiffs demonstrate the fiduciary duties specifically flow from a money-mandating statute.  *See White Mountain Apache,* 37 U.S. at 472.  The "other source of law need not explicitly provide that the right or duty it creates is enforceable through a suit for damages."  *Navajo II,* 556 U.S. at 290.  Rather, "the statute and regulations must be such that they 'can fairly be interpreted as mandating compensation by the Federal government for the damage sustained.'"  *Roberts v. United States* 745 F.3d 1158, 1162 (Fed. Cir. 2014) (quoting *White Mountain Apache Tribe*, 537 U.S. at 472); *see also White Mountain Apache Tribe*, 537 U.S. at 480 ("The dispositive question, accordingly, is whether the [substantive source of law] . . . is *fairly interpreted* to mandate compensation. . . .") (emphasis added).

Unlike the first step of the *Navajo II* analysis, in the second step the Court can look to common law trust principles when considering whether the statute provides for damages as a remedy for breach.  *Inter-Tribal Council of Ariz. Inc.*, 956 F.3d at 1338.  These principles can inform the "interpretation of statutes and to determine the scope of liability that Congress has imposed." *Jicarilla*, 564 U.S. at 177.  Specifically, "principles of trust law might be relevant in drawing the inference that Congress intended damages to remedy a breach."  *Navajo II*, 556 U.S. at 291.  If "the Tribe cannot identify a specific, applicable, trust creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter."  *Jicarilla*, 564 U.S. at 177 (quoting *Navajo II*, 556 at 302).

The Supreme Court in *Mitchell II* found the forest management statutes are money-mandating.  *Mitchell II*, 463 U.S. at 226.  The Court observed "[b]ecause the statutes and regulations at issue in this case clearly establish fiduciary obligations of the government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal government for damages sustained."  *Id.*  The Court further observed "[g]iven the existence of a trust relationship, it naturally follows that the [g]overnment should be liable in damages for the breach of its fiduciary duties."  *Id.* at 226.

Relying on *Mitchell II*, the Federal Circuit in *Confederated Tribes* reaffirmed the same forest management statutes are money mandating.  *See Confederated Tribes*, 248 F.3d at 1370 (Fed. Cir. 2001).  The court observed "[t]ribes that own timber managed by the *federal* government enjoy the right of an injured beneficiary to seek damages for alleged breaches of the fiduciary obligations that are defined by the statutes and regulations that give the federal government the responsibility to manage Indian timber resources for the Indians' benefit."  *Id.*  Specifically, the Court found in the "case of a breach consisting of a sale of timber assets for less than their full value, the tribes are entitled to recover [damages]."  *Id.* at 1371.

### B.  Stating a Plausible Claim Upon Which Relief Can be Granted

To find a plaintiffs' claim is plausible on its face under the Indian Tucker Act, the Court must first determine whether the plaintiffs satisfied the *Navajo II* jurisdictional test. *See Navajo II*, 556 U.S. at 290–91. If the Court determines it has jurisdiction to hear plaintiffs' claim, it must identify the fiduciary duties established by the source of substantive law and then determine whether the plaintiff's complaint alleges sufficient facts to plausibly claim the government breached those duties. *Inter-Tribal Council of Ariz., Inc*, 956 F.3d at 1338.

"The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant as acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Accordingly, in the breach-of-trust context, the Court must determine whether plaintiffs alleged sufficient facts to demonstrate it is plausible that the government failed to perform its fiduciary duties.[10] *See id.*

### C. Considering Supplemental Facts and Exhibits Not Included in the Complaint

A motion to dismiss under RCFC 12(b)(1) is either a facial challenge or a factual challenge to the complaint. *See Cedars-Sinai Medical Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (discussing the difference between facial and factual challenges). "If a Rule 12(b)(1) motion simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading." *Id.* A factual challenge disputes the facts presented in the complaint. *Id.* Factual challenges allow plaintiffs to present supplemental factual information to support their claims. *See KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936) ("But where the [factual] allegations . . . are challenged by the defendant in an appropriate manner, the plaintiff must support them by competent proof."). To admit plaintiffs' supplemental facts, the Court must: (1) determine whether plaintiffs' alternative statutory jurisdictional theory outside *Mitchell II* is viable; and (2) whether the government's motion to dismiss contains any factual allegations to which a response from plaintiffs is necessary. *Id.*

### VI. Whether this Court has subject-matter jurisdiction over plaintiffs' claim

Plaintiffs argue this Court has Indian Tucker Act jurisdiction through two independent sources of substantive law, both of which create fiduciary duties enforceable through damages. First, the Forest Management Statutes, and second, the Treaty of 1855. Compl. ¶¶ 11–12. Plaintiffs present both theories as alternative bases for jurisdiction over a single claim. This Court has subject-matter jurisdiction over plaintiffs' claim if either theory satisfies the *Navajo II* test.[11]

---

[10] As discussed *infra*, during oral argument, the government acquiesced if the Court finds it has jurisdiction under the *Navajo II* test, the plaintiffs' argument that the government failed to approve sufficient timber harvests to meet the AAC is evidence the government breached its fiduciary duties. *See* Tr. at 110:6–12.

[11] When any one basis for jurisdiction presented by a plaintiff can independently support a single claim for relief, an alternative theory's failure does not destroy this Court's subject-matter jurisdiction. *See, e.g., Ash v. Richards*, 572 Fed. Appx. 52, 53 n.2 (2d Cir. 2014) (finding the plaintiff made a prima facie showing of jurisdiction under one theory, and declining to consider the remaining theories of jurisdiction); *Garcia v. NRI USA, LLC*, 2018 WL 2315962, *2 (C.D. Cal. 2018) ("The Court needs only one basis for subject-matter jurisdiction.").

### A. Whether the forest management statutes provide this Court subject-matter jurisdiction over plaintiffs' claim

The network of forest management statutes and regulations governing timber harvests on the Yakama Reservation are the primary sources of substantive law upon which plaintiffs rely to support their claim. Compl. ¶¶ 11–12; Tr. at 14:17–24 (plaintiffs arguing "[t]he Court has subject matter jurisdiction under certain forestry statutes and the general forestry regulations set forth in 25 CFR [] 163."). This includes (1) the forest management statutes analyzed by the Supreme Court in *Mitchell II*; and (2) NIFIRMA and its implementing regulations. Compl. ¶¶ 11–12. This Court has jurisdiction over claims brought under these statutes and regulations so long as plaintiffs rely on specific provisions therein creating fiduciary duties enforceable through damages. *Navajo II*, 536 U.S. at 290.

### 1. Whether this Court has jurisdiction over plaintiffs' claim under the forest management statutes analyzed by the Supreme Court in *Mitchell II*

In *Mitchell II*, the Supreme Court found this Court has Indian Tucker Act jurisdiction over breach-of-trust claims rooted in the statutes and regulations governing timber management on Indian lands. *See Mitchell II*, 463 U.S. 206, 226 (1983) ("[T]he [forest management] statutes and regulations at issue in this case clearly establish fiduciary obligations of the [g]overnment in the management and operation of Indian lands and resources . . . .").[12] Since then, courts have routinely asserted jurisdiction over claims for money damages stemming from the government's mismanagement of tribal-forest resources under the same substantive statutes at issue here. *See, e.g., Confederated Tribes*, 248 F.3d 1365, 1370 (Fed. Cir. 2001) (finding the government breached fiduciary duties in managing tribal forest land); *Apache Tribe of Mescalero Reservation v. United States*, 43 Fed. Cl. 155 (1999) (same); *Navajo Tribe of Indians v. United States*, 9 Ct. Cl. 336 (1986) (same); *The Blackfeet Tribe of the Blackfeet Reservation v. United States*, Case No. 12-429L, ECF No. 62 (Fed. Cl. Aug. 21, 2015) (same). In fact, the government conceded at oral argument it cannot identify a case in which a court found it lacked Indian Tucker Act jurisdiction over a breach-of-trust claim stemming from the forest management statutes plaintiffs assert here. *See* Tr. at 50:19–51:4 (when asked by the Court whether "the [g]overnment [has] any precedential cases for the prospect that *Mitchell II* does not still control in situations like this, or . . . precedential case[s] where timber management issues were alleged and there was no jurisdiction to be found," government counsel responded they "don't think [they] have a case" and agreed "this would be the first" such case).

The crux of the government's argument appears to be that plaintiffs' complaint fails to state in sufficient detail the specific statutory provisions plaintiffs rely on as creating specific fiduciary duties. *See* Tr. at 67:22–68:2 ("[W]hat Navajo teaches is that you've got to look at the specific fiduciary or other duty, not a whole suite of statutes. You have to identify a specific fiduciary or other duty. And the duty that has been identified here is a duty to maximize

---

[12] The Federal Circuit in *Hopi Tribe v. United States* recognized the collection of forest management statutes in *Mitchell II* is the quintessential example of statutorily created fiduciary duties. 782 F.3d 662, 667 (Fed. Cir. 2015) (quoting *Mitchell II*, 463 U.S. at 224–25) ("Based on this trust-evoking language and the statutory and regulatory prescriptions giving the United States 'full responsibility' over Indian resources, the Supreme Court found that Congress had accepted a fiduciary duty to manage timber resources according to those specific prescriptions.").

revenues. And it's just . . . not in the statute."). The government correctly notes an Indian Tucker Act jurisdictional analysis requires this Court to consider whether the complaint identifies "specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo II*, 556 U.S. 287, 296 (2009). The Supreme Court has not, however, created a heightened pleading requirement for claims brought under the Indian Tucker Act. While plaintiffs must base their claim on specific fiduciary duties prescribed by statutes or regulations, the complaint itself need not detail the complete legal theory underlying the claim for a breach of fiduciary duties. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (*per curiam*) ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiffs claim for relief.") (quoting 5 Wright & A. Miller, Federal Practice and Procedure § 1219, p. 277–78 (3d ed. 2004)).

As a jurisdictional matter, there is little distinction between the claims at issue in *Mitchell II* and plaintiffs' claim here. Plaintiffs rely on the same statutory and regulatory framework governing Indian-forest management to both define the fiduciary relationship between the government and the Tribe and prescribe the government's specific fiduciary duties owed in managing Indian timber resources. Compl. ¶¶ 11–12. This includes the statutes and regulations analyzed by the Supreme Court in *Mitchell II*. *Id.* at ¶ 11 (citing 25 U.S.C. §§ 406–7, 5109 (previously 25 U.S.C. § 466)); Tr. at 41:21–24 (Plaintiffs expressing to the Court they "cite all of the statutes that the [p]laintiffs relied upon in *Mitchell I* and *Mitchell II*."). While the government casts plaintiffs' complaint as relying only on "the aspirational statement" contained in NIFIRMA as the purported source of statutorily prescribed fiduciary obligations, Gov't Resp. to Pls.' Surreply at 2, a plain reading of the complaint proves otherwise. Compl. ¶¶ 11–12. The complaint expressly cites the 1910 and 1934 forest management statutes as creating fiduciary duties, both of which the Supreme Court considered in *Mitchell II* when determining whether breach-of-trust claims rooted in these statutes are jurisdictional under the Indian Tucker Act. *See* Compl. ¶ 12*; Mitchell II*, 463 U.S. at 219–23. The Court finds no reason to limit its jurisdictional analysis, as the government argues it should, to the specific provision of NIFRMA quoted in the complaint. *See* Gov't Resp. to Pls.' Surreply at 2; Gov't Reply at 13; Tr. at 26:6–9 (Government counsel arguing "[t]he only specific statutory provision that the [p]laintiffs identify is the language in NIFRMA"). Therefore, the Court will consider the full spectrum of the forest management statutes asserted by plaintiffs in analyzing the viability of plaintiffs' claim. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1288 (Fed. Cir. 1999) (stating that when considering a motion to dismiss, the court has an obligation to construe a complaint "broadly" and "draw[] all inferences in [plaintiff's] favor.").

The government attempts to distinguish this case from *Mitchell II* by arguing the *Mitchell II* Court only considered the fiduciary responsibilities owed to individual *allottees*. Gov't Mot. to Dismiss at 8 ("On the facts of *Mitchell II*, the 'comprehensive control' that provided part of the basis for decision resulted from the fact that the lands at issue were *allotted* lands.") (internal citations omitted) (emphasis in original). The government emphasizes the lands at issue in *Mitchell II* were individual allotments rather than land held in tribal trust like the Yakama forest lands at issue here. 463 U.S. at 207 ("The principal question in this case is whether the United States is accountable in money damages for alleged breaches of trust in connection with its management of forest resources on *allotted* lands of the Quinault Indian Reservation."). (emphasis added). The Supreme Court's conclusion the forest management statutes created

fiduciary duties enforceable through damages, however, did not rest on the land's classification as allotted rather than tribal trust land. *Id.* at 228. ("We thus conclude that the statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities *in the management of Indian property*.") (emphasis added). Nor has any other court analyzing breach-of-trust claims in the Indian timber-management context found the distinction between allotted lands and unallotted lands material to the Indian Tucker Act jurisdictional analysis. The government's fiduciary responsibilities might indeed be *greater* in the context of allotted land, yet no court has ever found such a distinction limits the Congressionally prescribed fiduciary commitments to *only* allotted land. *See id.*

The government's argument why plaintiffs' claim is not viable under the Indian Tucker Act centers on the absence of exclusive and comprehensive control over Yakama tribal lands. *See* Gov't Mot. to Dismiss at 19–20 ("[F]orest management under the Act Plaintiff invokes is a far cry from the 'exclusive' and 'plenary' control at issue in *Mitchell II* and *White Mountain Apache*."). The government cites a series of Supreme Court cases—including the Supreme Court's analysis in the *Navajo* cases—in discussing why plenary control creates fiduciary obligations in certain scenarios to argue these later cases "modified" *Mitchell II*. *Id.* at 6 (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011); *Navajo I*, 537 U.S. 488 (2003); *Navajo II*, 556 U.S.; *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003)); Tr. at 60:16–24 (government counsel arguing *Navajo II* and *Jicarilla* "certainly modified . . . *Mitchell II*" and "it's quite clear that the Supreme Court's emphasis has changed"). In support of this position, the government points to the Court's language in *Navajo II* stating "[t]he Federal Government's liability cannot be premised on control alone . . . [but rather] the analysis must begin with 'specific rights-creating or duty-imposing statutory or regulatory prescriptions.'" *Navajo II*, 556 U.S. at 301 (internal citations omitted); Tr. at 61:4–10. The government points to this language as showing "that *Mitchell II* does not establish that the Supreme Court has concluded certain statutes and regulations clearly establish fiduciary obligations." Tr. at 63:5–10. The government further contends *Mitchell II* is distinguishable because "there were allottees at issue in *Mitchell II* . . . [and] under the current regulatory regime, under NIFRMA, . . . Congress intended specifically to expand [] and enrich [the role of the tribe in managing resources]. It was intended that the tribes become much more independent under the regime created in NIFRMA." Tr. at 62:7–13.

As plaintiffs noted at oral argument, however, the majority in *Navajo II* concluded neither of the two statutes asserted by the tribe as creating jurisdiction under the Indian Tucker Act applied to the mineral lease. *See Navajo II*, 556 U.S. 295–300. In *Navajo II*, the Supreme Court reversed the Federal Circuit's decision, which wrongly "suggested that the [g]overnment's 'comprehensive control' over coal on Indian land gives rise to fiduciary duties based on common-law trust principles." *Navajo II*, 556 U.S. 301. The Supreme Court emphasized the jurisdictional analysis must "begin with 'specific rights-creating or duty-imposing statutory or regulatory prescriptions,'" whereas "any [trust] principles premised on 'control' must be the second step of the analysis, not (as the Federal Circuit made it) the starting point." *Id.* (citing *Navajo I*, 537 U.S. at 506). The statutes at issue in *Navajo II* do not create even a "limited trust relationship," so the Court did not need to "reach the question whether the trust duty was money mandating" to consider the jurisdictional question under the Indian Tucker Act. *Navajo II*, 556

U.S. 301–302; Tr. at 65:5–9 (plaintiffs arguing *Navajo II* does not affect the *Mitchell II* analysis because "Justice Scalia concluded that both of those statutes did not apply to the lease . . . [and therefore] Justice Scalia never proceeded to the second step of the analysis, what would be the fiduciary duties that could be breached and possibly give rise to money-mandating damages."). Given the limited holding on jurisdiction, the Supreme Court's language on control can be read as *dicta*—not explicitly modifying the Court's previous *Mitchell II* analysis or the pleading requirements for a Native American tribe under the Indian Tucker Act. *See Navajo II*, 556 U.S. 301–302.

Further, nothing in the Court's opinion in the *Navajo* cases, nor the other cases cited by the government, evidences any intent to limit the *Mitchell II* analysis and holding to the facts of that case alone. In fact, each of the post-*Mitchell II* cases the government cites involved the Supreme Court explicitly considering whether the underlying statutory scheme at issue was sufficiently similar to the forest management statutes analyzed in *Mitchell II* for a fiduciary relationship to exists. *See Navajo I*, 537 U.S. at 507 (comparing the Indian Mineral Leasing Act to the forest management statutes at issue in *Mitchell II)*; *White Mountain Apache*, 537 U.S. at 475 (comparing the 1960 Fort Apache Act to *Mitchell II)*; *Navajo II*, 556 U.S. at 294 (comparing the Surface Mining Control and Reclamation Act of 1977 to *Mitchell II)*.[13]

While discussion of comprehensive control might be relevant to an Indian Tucker Act jurisdictional analysis when examining whether other statutory schemes create fiduciary duties enforceable by money damages, it is irrelevant to plaintiffs' claim here because their claim is based on the same forest management statutes the Supreme Court found created jurisdiction in *Mitchell II*. This case, thus, is distinguishable from the Federal Circuit's *Hopi Tribe* decision. The issue in *Hopi Tribe* was whether a number of federal statutes, including the Executive Order of 1882 and the Act of 1958 (interpreted under the reserved-water-rights doctrine), the Indian Health Improvement Act, and the Indian Sanitation Facilities Act, imposed specific obligation on the United States to provide adequate drinking water that would give rise to a claim for money damages. *Hopi Tribe v. U.S.*, 782 F.3d 662 (Fed. Cir. 2015). By citing *Hopi Tribe*, the government seeks to emphasize that the court in *Hopi Tribe* found comprehensive control over trust resources—construction of a water system on tribal land—is not, by itself, enough to create specific fiduciary duties enforceable through damages, whereas the previously-issued *Mitchell II* decision was decided at least partly on the basis of the Secretary's "exclusive authority to sell or approve the sale of timber on allotted Indian lands." Gov't Motion to Dismiss at 8 (citing *Hopi Tribe v. U.S.*, 782 F.3d at 667). The government is incorrect, however, in arguing *Hopi Tribe* reflects an alteration to the *Mitchell II* jurisdictional test in the timber-management context. The Supreme Court in *Mitchell II* did not rely solely on the government's comprehensive control over trust resources to find the existence of a trust relationship, but rather noted "[t]he language of [the] statutory and regulatory provisions" at issue in *Mitchell II* and in this case "directly support[] the existence of a fiduciary relationship." 463 U.S. at 224. The Federal Circuit in

---

[13] The government agrees the *U.S. v. Jicarilla Apache Nation*, 564 U.S 162 (2011) is not a jurisdictional case and the facts are not similar to the present case. *See* Tr. at 61:17–23 (The government's counsel stated "[t]he facts on *Jicarilla* have very little relationship to the facts here."). Rather, *Jicarilla* addressed the question of "whether the fiduciary exception [to attorney-client privilege] applies to the general trust relationship between the United States and the Indian tribes." *Jicarilla*, 564 U.S. at 165. The Supreme Court held the exception to attorney-client privilege does not apply to the general trust relationship between the government and Indian tribes. *Id.*

*Hopi Tribe* noted the "trust-evoking language and the statutory and regulatory prescriptions" of the statutes at issue in *Mitchell II* meant "Congress had accepted a fiduciary duty to manage timber resources according to those specific prescriptions." 782 F.3d at 667 (quoting *Mitchell II*, 463 U.S. at 224–25).

The federal statutes the *Navajo* plaintiffs relied on—which the Supreme Court found were not jurisdictional—are also easily distinguishable from the tribal forest management statutes analyzed in *Mitchell II*. The Court in *Navajo I* considered whether the Indian Mineral Leasing Act ("IMLA") created a fiduciary responsibility for the tribe to obtain the most revenue from mineral royalties generated by coal leasing on tribal land. *Navajo I*, 537 U.S. at 506. The *Navajo I* Court observed the government's role was almost ministerial in nature, with the tribe serving as the primary negotiator when defining the terms of a lease with third-party mining companies. *Id.* at 507 ("The IMLA simply requires Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective."). "[T]he IMLA and its regulations do not give the Federal Government full responsibility to manage Indian resources ... for the benefit of the Indians," distinguishing the IMLA from the tribal forest management program. *Id.* at 507 (citing *Mitchell II*, 463 U.S. at 224) ("The IMLA and its implementing regulations impose no obligations resembling the detailed fiduciary responsibilities that *Mitchell II* found adequate to support a claim for money damages."). In contrast, the government in this case acknowledged at oral argument it "has the lead role in timber management" for the Yakama forest. Tr. 38:22–39:3; *see also* Tr. at 38:12–17 (government counsel acknowledging, unlike the case in *Navajo I* and *Navajo II*, the Yakama Nation does not have a "veto power" over the sale of timber resources.).[14]

Similarly, in *Navajo II* the Court found the plaintiffs' reliance on the Navajo–Hopi Rehabilitation Act of 1950 and the Surface Mining Control and Reclamation Act (SMCRA) insufficient to create Indian Tucker Act jurisdiction. 556 U.S. at 295.[15] Unlike the plaintiffs in *Mitchell II*, the plaintiffs in *Navajo II* failed to identify specific provisions within SMCRA creating fiduciary duties, instead relying on the extent of management control inherent in the statute's mineral resources program on tribal land. *Id.* at 301. The Supreme Court in *Navajo II* rejected the plaintiffs' argument that the government's "comprehensive control" over coal mining on tribal land is sufficiently similar to the timber management statutes at issue in *Mitchell II*. *Id.* The Court concluded such a theory cannot support Indian Tucker Act jurisdiction because the "Federal Government's liability cannot be premised on control alone." *Id.* Ultimately, the Court found, unlike the Indian-forest management statutes, the statutes relied on by plaintiffs in *Navajo II* failed to create enforceable fiduciary obligations. *Id.* at 301–02. The statutory schemes insufficient to create jurisdiction under the Indian Tucker Act in *Hopi Tribe* and the *Navajo* cases have been clearly distinguished as independent from the forest management statutes at issue in *Mitchell II* and this case. *See, e.g. Hopi Tribe*, 782 F.3d at 671 ("The statutes

---

[14] The government argues the Tribe has some control over timber resource management of the Yakama forest. Tr. 27:2–10. Some control over the resource by the tribe, however, does not necessarily relieve the government of its fiduciary duties. *See* 1 Cohen's Handbook of Federal Indian Law § 17.04 (2019) ("[E]ven if tribes assume partial or complete management of their forests, NIFRMA still preserves federal authority to approve tribal contracts and programs, forest plans, integrated management plans, and timber sales.")

[15] The Supreme Court first observed plaintiffs' reliance on the statutes was misplaced because the lease at issue was not issued pursuant to either statute. *Navajo II*, 556 U.S. at 299, 300. Therefore, the Court did not reach the question of whether the statutes created fiduciary duties enforceable through damages.

asserted here do not give the kind of 'full responsibility' and 'elaborate control' over water resources that the Supreme Court found to support a fiduciary relationship regarding timber resources in *Mitchell II*); *Navajo II*, 556 U.S. at 294 ("We distinguished *Mitchell II*, which involved a series of statutes and regulations . . .creat[ing] a fiduciary duty with respect to Indian timber . . . neither the IMLA nor its regulations established any analogous duties or obligations in the coal context.").

The Supreme Court's reasoning in *Mitchell II* is applicable to plaintiffs' claim. The relevant question, therefore, is whether plaintiffs' claim against the government for failing to approve timber harvests, if true, breaches the government's fiduciary duties to the Tribe as identified in the complaint. *See Navajo II*, 556 U.S. at 295.

The government argues plaintiffs' claim is based solely on the government's failure to maximize timber harvests and the resulting revenue. *See* Gov't Reply at 13–14; Tr. at 25:22–23 ("[T]he duty [plaintiffs are] trying to extract from the statute is a duty to maximize revenues. And it's simply not there."). The Court does not read plaintiffs' complaint so narrowly. *See First Hartford Corp. Pension Plan &Trust v. United States*, 194 F.3d 1279, 1288 (Fed. Cir. 1999) (stating that when considering a motion to dismiss, the court has an obligation to construe a complaint "broadly" and "draw[] all inferences in [plaintiff's] favor."). While the complaint asserts the government failed to approve timber sales to "obtain the greatest revenue for the Yakama Nation consistent with the proper protection and improvement of the Yakama Forest," Compl. ¶ 12, the failure to maximize revenue is not the only specific fiduciary duty the government allegedly breached. Rather, the plaintiffs rely on the panoply of specific duties contained within the various statutes and regulations governing management of tribal forests. *See* 25 U.S.C. §§ 406–407, 466, 3104; *see also* Pls.' Resp. at 23 (listing the specific duties the government allegedly breached, and tying each duty to specific statutes and regulations); Tr. at 70:20–71:4 (plaintiffs arguing "it's inaccurate for the United States to say that the only source of authority . . . that the [p]laintiffs relied upon in Paragraph 12 [of the complaint] is NIFRMA."). At the pleading stage, the Court may look to the underlying statutes and regulations themselves, rather than the complaint alone, to determine if claims relying on such statutes are jurisdictional under the Indian Tucker Act. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curium) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."). Accordingly, the Court concludes plaintiffs' complaint contains a "short and plain statement of the grounds for the court's jurisdiction." RCFC 8(a)(1).

The government further attempts to characterize the AAC, which provides a target-maximum for the forest's timber resources under the principles of sustained yield as mandated by federal forest management statutes, as a source of fiduciary obligations plaintiffs rely on. Gov't Reply at 16. Plaintiffs' claims rest on the assertion the AAC reflects the specific, duty-imposing statutory and regulatory prescriptions enforceable by a claim for damages. *Navajo II*, 537 U.S. at 290–91; Tr. at 107:12–18 ("Plaintiffs have never taken the position . . . that the forest management plan itself is a substantive source of law for jurisdictional purposes. [Plaintiffs] take the position that it is the principal document identified by NIFRMA and the federal regulations by which the United States fulfills its fiduciary obligations."). Chief among those is the government's obligation to manage the forest "in accordance with the principles of sustained

yield." 25 U.S.C. § 407.  In other words, while the AAC is a benchmark by which plaintiffs ask the Court to measure the government's breach of fiduciary duties, the AAC does not, in and of itself, create any fiduciary obligation—nor do plaintiffs argue as much.  Accordingly, the Court is not persuaded by the government's argument that plaintiffs improperly relied on the AAC as a source of fiduciary obligations.

Ultimately, the Supreme Court's holding in *Mitchell II* on the federal forest management statutes controls here.  *See Mitchell II*, 463 U.S. at 226.  Plaintiffs identified in the complaint relevant statutes upon which they base their claim sufficient to give the government notice as required by the longstanding principles of notice pleading.  *See Shoshone Indian Tribe of the Wind River Reservation v. United States,* 52 Fed. Cl. 614, 627 (2002) (stating that a complaint need only "notif[y] the defendant and the court of the nature of [the claim] in order to avoid surprise.").  Accordingly, the Court finds it has jurisdiction over plaintiffs' claim.  *See Mitchell II*, 463 U.S. at 226; *see also Confederated Tribes*, 248 F.3d at 1370 (holding the court has jurisdiction over claims alleging the government breached its fiduciary duty to manage Indian forest land consistent with the principles of sustained yield).

### 2.  Whether NIFRMA affects this Court's jurisdiction over plaintiffs' claim

The government further argues the Court does not have jurisdiction over plaintiffs' claim because NIFRMA altered the fiduciary duties recognized by the Supreme Court.  Tr. at 50:3–18.  Accordingly, the Court next considers whether NIFRMA affects the Court's jurisdiction over plaintiffs' claim, which necessarily includes determining whether NIFRMA altered the Supreme Court's holding in *Mitchell II*.

### a.  Whether NIFRMA altered the Court's holding in *Mitchell II*

In considering whether NIFRMA altered *Mitchell II*'s holding regarding the fiduciary relationship between the Tribes and the government, the Court need look no further than NIFRMA's saving clause.  25 U.S.C. § 3120 ("Nothing in this chapter shall be construed to diminish or expand the trust responsibility of the United States toward Indian forest lands, or any legal obligation or remedy resulting therefrom.").  Congress plainly intended for NIFRMA to not alter the Supreme Court's holding in *Mitchell II*.  *See* 1 Cohen's Handbook of Federal Indian Law § 17.04 (2019) (citing 25 U.S.C. § 3120) ("Express language in both NIFRMA and the Tribal Self-Governance Act of 1994 demonstrates the federal government's continuing trust responsibility for Indian forest lands.").  The Court assumes Congress was aware of the Supreme Court's *Mitchell II* decision when it enacted NIFRMA.  *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law.").  The government acknowledged at oral argument "courts typically presume that in acting Congress is aware of relevant prior judicial precedents," and the government "[doesn't] think [it] can say NIFRMA's goal was to disturb the holding in *Mitchell II*."  *See* Tr. at 55:2–4; 55:17–19.  Plaintiffs emphasize the use of the phrase "trust responsibility," rather than "trust relationship," in drafting NIFRMA's savings clause shows "Congress understood that a trust responsibility preexisted and predated the enactment of NIFRMA," and Congress explicitly sought to not modify the existing "trust responsibility of the United States toward Indian forest lands"

established under *Mitchell II*.  Tr. at 18:10–24.  The holding in *Mitchell II*—the government has a fiduciary duty in managing tribal forests resources—is, therefore, undisturbed by NIFRMA.

### b.  Whether NIFRMA bolsters plaintiffs' jurisdictional arguments

Having concluded NIFRMA did not alter *Mitchell II*, the Court next considers whether NIFMRA bolsters plaintiffs' jurisdictional arguments.  Contrary to the government's contentions, NIFRMA's management objectives are not merely "aspirational statements."  Gov't Resp. to Pls' Surreply at 2; Tr. at 9:18–25 (government counsel describing the language of NIFRMA and 25 C.F.R. 163 as "aspirational goals of federal tribal forest management.").  The list of objectives in 25 U.S.C. § 3104 clarify the government's fiduciary obligations to the tribes as recognized by the Court in *Mitchell II*, including the obligation tribal forests are managed "in a perpetually productive state in accordance with the principles of sustained yield."  25 U.S.C. § 3104(b)(1). When read in context with the rest of NIFRMA, this provision reflects the "judicial gloss" the Supreme Court superimposed onto the forest management statutes analyzed in *Mitchell II*.  *See Mitchell II*, 463 U.S. at 221–24 (discussing why Congress intended the government manage tribal forests in a "permanently productive" state and "yield continuous revenues to the tribes."); *Skilling v. United States*, 561 U.S. 358, 412 (2010) (observing a "judicial gloss" can provide clarity to "an otherwise uncertain statute") (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)).  Congress' subsequent clarification of the government's fiduciary duties related to tribal forest resources—in light of the Court's decision in *Mitchell II*—suggests an intent to eliminate ambiguity related to the government's obligations, rather than, as the government argues, merely promulgate a list of non-binding goals.

NIFRMA also makes clear the government's management responsibilities are not optional.  *See* 25 U.S.C. 3104(b) ("The Secretary [of the Interior] *shall* undertake forest land management activities on Indian Forest Land . . . .") (emphasis added).  Such a plain directive from Congress controverts any argument the BIA is not obligated to, at minimum, work toward achieving the statutorily prescribed objectives as best as possible.  The government notes some tension exists between these goals enumerated in NIFRMA.  *See* Gov't Mot. to Dismiss at 16 ("If Congress intended that the United States be liable in damages for not achieving any one of the many goals set out in the statute, the result would be impossibly conflicting standards and virtually inevitable liability whatever policy balance is struck."); Tr. at 11:9–12 (the government describing the language in § 3014(b) of NIFRMA as a "statement of objectives encompass[ing] a broad range of objectives, not all of which are mutually compatible.").  Such tension does not, however, vitiate the expression from Congress requiring the government "shall" undertake forest management activities, and these activities must strive to ensure the Tribe receives "the benefit of all the labor and profit" the forest is capable of yielding.  25 U.S.C. 3104(b)(4).

When the parties argue the merits of plaintiffs' claim, the government could very well demonstrate a legitimate reason for not approving sufficient timber sales sufficient to achieve the AAC.[16]  The government, however, challenges plaintiffs' complaint on jurisdictional grounds

---

[16] As plaintiffs noted at oral argument, "if the United States believes that its failure to deliver timber sales to the Yakama nation" did not violate its fiduciary duties, or "[i]f there was a statutory obligation that prevented it from delivering timber sales to the Yakama nation," the government "can defend that on the merits," "[b]ut that's not a jurisdictional issue." Tr. at 20:14–21; see also Tr. at 21:17–21 (plaintiffs arguing "if the United States is going to

and the fundamental allegation of plaintiffs' complaint "is that the United States is failing to provide an adequate log supply for [the] current mill that's operated by Yakama Forest Products," due to "the failure to harvest something at or near the sustainable harvest level for the reservation."  Tr. at 94:12–17.  For purposes of a motion to dismiss for lack of subject-matter jurisdiction, however, the prescriptions in NIFRMA, coupled with the other forest management statutes, provide an adequate basis for a plausible claim that the government is obligated to pursue the management objectives enumerated in the statute.  *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see also Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curium) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

        Plaintiffs' invocation of NIFIRMA reinforces their jurisdictional argument.  The Court is unconvinced, when considered in combination with the other forest management statutes, NIFRMA does not buttress the government's existing fiduciary obligations established in *Mitchell II*.  *See Mitchell II*, 463 U.S. at 226.  While the Court does not reach the question of whether a plaintiff could rely solely on NIFRMA for a breach-of-trust claim—in other words, whether NIFIRMA independently reflects the enforceable fiduciary duties discussed in *Mitchell II*—the Court concludes NIFIRMA's additional prescriptive language clarifies what trust duties the government already owes to tribes in managing their timber resources under the other forest management statutes.[17]

### B.  Whether this Court has jurisdiction over plaintiffs' claim under the Treaty of 1855

        The Court need not consider the viability of plaintiffs' Treaty theory of jurisdiction because plaintiffs' reliance on the forest management statutes are sufficient, by themselves, for Indian Tucker Act jurisdiction.  The government stated at oral argument the Court must find jurisdiction for both grounds asserted by plaintiffs.  *See* Tr. at 104:16–105:6 ("[T]he teaching of *Navajo II* may well be that the jurisdictional hook has to be satisfied in both cases because . . . the jurisdictional question trains on specific statutory obligations . . . [and therefore] the Court needs to determine that it has jurisdiction as to each claim.").  The Court disagrees.  Plaintiffs assert a single claim for relief, but present two *jurisdictional* theories to support their claim.  All the Court must determine is whether either source of fiduciary duty creates Indian Tucker Act

---

come forward with an as-yet unexplained defense based on the competition between [the objectives detailed in NIFRMA], that'll happen at the merits stage.  But it shouldn't happen at the jurisdictional stage.").

[17] In *Mitchell II*, the Supreme Court found the "timber management statutes, 25 U.S.C. §§ 406–407, 466, and the regulations promulgated thereunder, 25 CFR Part 163 (1982), establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber."  463 U.S. at 222 (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)).  The Court noted this "regulatory scheme was designed to assure that the Indians receive 'the benefit of whatever profit [the forest] is capable of yielding.'"  *Mitchell II*, 463 U.S. 222–23 (quoting 25 C.F.R. § 141.3(a)(3)).  The specific regulatory provision cited by the Supreme Court in *Mitchell II* was incorporated almost verbatim into NIFRMA.  *See* 25 U.S.C. §3104(b)(4) ("Indian forest land management activities undertaken by the Secretary shall be designed to achieve . . . the development of Indian Forest lands . . . so that Indians may receive from their Indian forest land not only stumpage value, but also the benefit of all the labor and profit that such Indian forest land is capable of yielding.").  This provision of NIFRMA is what plaintiffs quote in paragraph 12 of their complaint.  Compl. ¶ 12.

jurisdiction.  *See, e.g., Ash v. Richards*, 572 Fed. Appx. 52, 53 n.2 (2d Cir. 2014) (declining to consider alternative jurisdictional arguments after finding the plaintiff made a prima facie showing under one theory);  *Garcia v. NRI USA, LLC*, 2018 WL 2315962, *6  (C.D. Cal. 2018) ("The Court needs only one basis for subject-matter jurisdiction."). The Court does not interpret plaintiffs' complaint as asserting different requests for relief depending on which jurisdictional theory the Court finds viable.  *See* Tr. at 93:23–94:3 (plaintiffs describing the underlying "theory of the case" as the claim "the United States is blocking an adequate supply of timber by failing to discharge its fiduciary duties").  Accordingly, the Court does not reach the question of whether the Treaty of 1855 imposes fiduciary duties on the government as it relates to managing the Tribe's timber resources at this time.

## VII.  Whether plaintiffs' claim is plausible based on the facts alleged in the complaint

Even if plaintiffs satisfy the *Navajo II* jurisdictional test, they must still plead sufficient facts to plausibly claim breach of the fiduciary duties identified in the complaint.  *See Iqbal*, 556 U.S. at 678.  In support of the argument plaintiffs plead sufficient facts in their complaint, plaintiffs at oral argument highlight paragraphs 11 and 12 of the complaint as "identify[ing] the substantive sources of law, including the suite of statutes . . .  and the Treaty and the regulations" and paragraph 13 of the complaint as alleging "that the United States has breached its fiduciary duties . . . by failing to prepare and improve sufficient timber sales to achieve the maximum AAC as authorized by applicable law."  Tr. at 112:5–18.  Paragraphs 11-13, in turn, "incorporate[s] by reference the background" facts of paragraph 6-9, which allege: "that the Yakama Reservation includes 650,000 acres of forest lands"; the United States "holds legal title to substantially all of the Yakama Forest in trusts for the Yakama Nation"; "at all material times the United States has managed the forest pursuant to the forest management plan"; "the stated purpose of the plan is to provide direction for forest management activities conducted by the BIA and the Nation"; and "the forest management plan expressly notes that the trust responsibility for the management of the reservation has been delegated to the BIA, and that the forest management plan defines how trust responsibilities and the Yakama Nation forest management goals and objectives will be fulfilled."  Tr. at 113:2–22.  Accordingly, plaintiffs argue it is "the complaint in its entirety" that "provide[s] the Court with facts suggesting a plausible claim for relief."  Tr. at 119:7–12.  The facts alleged in plaintiffs' complaint include the government's failure to "approve sufficient timber sales to achieve the maximum AAC . . . failing to provide an adequate log supply for YFP," and "failing to otherwise manage the Yakama forestry program in a manner that allowed the Nation to receive not only the stumpage value from its forest lands, but also the benefit of all labor and profit that the Yakama Forest is capable of yielding."  Compl. ¶ 13.

The government attempts to create a heightened pleading standard for Indian Tucker Act claims by invoking the *Navajo II* test to require more than what typical notice pleading requires.  *See* Tr. at 109:10–14 (government counsel stating he "[doesn't] think that the [p]laintiffs have necessarily stated an adequate cause of action under the forest management plan just because they may have satisfied *Navajo II* for jurisdictional purposes . . . .").  Plaintiffs highlighted at oral argument the tension "between the *Navajo II* test and the standard Rule 12(b)(6) formula": *Navajo II* requires "tribal claimants . . . to allege breaches of the duties, and the duties have to be based on substantive sources of law," whereas, "with the standard under Rule 12(b)(6), . . . legal conclusions are not given deference in the way factual allegations are claimed."  Tr. at 120:4–12;

*see also Inter-agency Tribal Council of Ariz.*, 956 F.3d 1328, 1338 (Fed. Cir. 2020) (quoting *Navajo II*, 556 U.S. at 291).  Plaintiffs note such tension makes "it[] difficult to know as a tribal plaintiff how you plead a complaint that satisfies both *Navajo II* as a sort of more general 12(b)(6)."  Tr. at 120:12–15.  The government agrees "[t]here is some tension there," but suggests the tension is not "as great as [p]laintiffs suggest."  Tr. at 121:11–12.

When Congress intends to "depart from the usual procedural requirements, it [does] so expressly."  *Jones v. Bock*, 549 U.S. 199, 200 (2007).  The government's heightened pleading standard is not reflected in the text of the Indian Tucker Act itself or the forest management statutes upon which plaintiffs' base their claim, nor has any case held as much.  When asked at oral argument whether the government was "aware of any example where a tribe has brought a claim under the Indian Tucker Act and survived a 12(b)(1) motion but the case was dismissed under a Rule 12(b)(6) [motion]," government counsel responded he was "not aware . . . of a case" "where the entire claim was dismissed."  Tr. at 110:13–19.  The government further conceded at oral argument, "if the Court has jurisdiction to entertain the claims, . . . [p]laintiffs may be right that what they have to say about the annual allowable cut and about the forest management plan conceivably might be evidence on the claims as to which the Court has found itself to have jurisdiction . . . ."  Tr. at 110:6–12.  Ultimately, plaintiffs need only point to the specific factual allegations in the complaint plausibly claiming a breach of the statutorily prescribed fiduciary duties.  *See Inter-Tribal Council of Ariz.*, 956 F.3d at 1338 ("A complaint should not be dismissed for failure to state a claim, 'unless the complaint fails to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiffs clear this hurdle.

Taken together, plaintiffs' factual allegations regarding the government's failure to approve sufficient timber sales establish it is plausible the government breached various fiduciary responsibilities prescribed in the forest management statutes.  *See Iqbal*, 556 U.S. at 679 ("[D]etermining whether a complaint states a plausible claim for relief . . . is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  While plaintiffs' complaint does not enumerate in detail each of the various fiduciary responsibilities the forest management statutes impose on the government, the complaint need not provide such detail.  *See Johnson*, 574 U.S. at 11.  The Court recognizes plaintiffs' brief in response to the government's motion to dismiss provides a granular discussion regarding the specific fiduciary duties the government allegedly breached, *see* Pls.' Resp. at 23, and included citations to the specific provisions within the statutes and regulations creating these duties.[18]  *Id.*  Such detail is unnecessary, however, for a plaintiff's complaint to meet the plausibility requirement.  *See Oliva v. United States*, 961 F.3d 1359, 1363 (Fed. Cir. 2020) (noting plaintiffs plead a substantively plausible claim when they "stated simply, concisely, and directly events that, [the plaintiffs] alleged, entitled them to damages") (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014)).

## VIII.  Whether this Court can consider plaintiffs' supplemental facts and exhibits

---

[18] The government conceded at oral argument, "if the Court finds that the [p]laintiffs survive the 12(b)(1) motion to dismiss due to the federal statutory regime in *Mitchell II*," an alleged violation of the forest management plant "could provide relevant evidence" of a violation of the Government's fiduciary duties.  Tr. at 121:21–122:7.

Based on the facts contained in the complaint, the Court finds it has jurisdiction under the Indian Tucker Act and plaintiffs' claim is plausible.  The Court, therefore, does not need to resolve the question of whether it may consider plaintiffs' supplemental jurisdictional facts and exhibits.

## IX.  Conclusion

For the forgoing reasons the Court finds it has jurisdiction to hear plaintiffs' claim and plaintiffs' claim is facially plausible.  Accordingly, the Court **DENIES** the government's motion to dismiss.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge